IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
01/06/2015

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ASR 2401 FOUNTAINVIEW, LP** | § | **Case No. 14-35322** |
| | § | |
| Debtor | § | **(Chapter 11)** |
| | § | |
| | § | |
| **ASR 2401 FOUNTAINVIEW, LLC** | § | **Case No. 14-35323** |
| | § | |
| Debtor | § | **(Chapter 11)** |
| | § | |
| | § | **Jointly Administered** |
| | § | |

**AGREED ORDER GRANTING DEBTORS' EXPEDITED MOTION FOR ORDER (I)
AUTHORIZING PREFERRED INCOME PARTNERS IV, LLC TO EXERCISE ITS
CONTRACTUAL RIGHT TO ASSUME CONTROL OF ASR 2401 FOUNTAINVIEW,
LLC AND (II) APPROVING THE DEBTORS' EMPLOYMENT OF
JETALL COMPANIES, INC. AS PROPERTY MANAGER**
(Relates to Doc. No. 47)

Upon consideration of ASR 2401 Fountainview, LP and ASR 2401 Fountainview, LLC's

Expedited Motion for Order (I) Authorizing Preferred Income Partners IV, LLC to Exercise its

Contractual Right to Assume Control of ASR 2401 Fountainview, LLC and (II) Approving the

Debtors' Employment of Jetall Companies, Inc. (Docket No. 47) ("Motion"); and it appearing

that the Court has jurisdiction to consider the matter; and good cause being shown; and due and

proper notice of the Motion[1] having been given, the Court is of the opinion that the proposed

relief requested in the Motion should be granted. Therefore it is hereby

ORDERED that the Motion is GRANTED as expressly set forth herein; it is further

---

[1] All capitalized terms not specifically defined herein are ascribed the definitions assigned in the Motion

ORDERED Preferred Income Partners IV, LLC may assume operational control of ASR 2401 Fountainview, LLC with respect to the operation and management of the Property; it is further

ORDERED that the LP Debtor is authorized to retain Jetall Companies, Inc. to manage the LP Debtor's Property; it is further

ORDERED that ASR Management and/or American Spectrum Management Group, Inc. (collectively, "ASR Management"), ASR Inc., American Spectrum Realty Operating Partnership, American Spectrum Realty, Inc., and all other American Spectrum Realty ("ASR") related entities (collectively, the "ASR Entities"), shall cooperate with Preferred Income Partners IV, LLC and Jetall Companies, Inc. in transitioning management and control of ASR 2401 Fountainview, LLC and its operations to PIP, including transitioning to management of the Property by Jetall Companies, Inc. (as specifically set forth in the Management and Exclusive Leasing Agreement attached hereto as **Exhibit A** (the "Management Agreement")); it is further .

ORDERED that ASR 2401 Fountainview, LLC is authorized to enter into the Agreement to Delegate, Assume, and Assign Authority with Jetall Companies, Inc. attached hereto as **Exhibit B**; it is further

ORDERED that ASR 2401 Fountainview, LP is authorized to enter into the Management Agreement with Jetall Companies, Inc. attached hereto as **Exhibit A**, and ASR Management and/or any other ASR Entities are hereby removed as the manager(s) of the Property under any prior agreement(s); it is further

ORDERED that the Management Agreement, PIP, the Debtors, and Jetall Companies, Inc., in their respective capacities with respect to the Property and the Debtors, shall be subject to and be governed by all applicable terms, conditions, covenants, and obligations (including

consent, reporting, and all other provisions and duties owing to JPMCC 2006-LDP7 Office 2401, LLC (the "Noteholder") as set forth in the Loan Documents (as defined, set out, and limited in the Agreed Third Interim Order Approving Use of Cash Collateral and Granting Partial Adequate Protection filed at Docket No. 56 (the "Cash Collateral Order")), including, but not limited to, the Noteholder's right to review and approve all leases as set forth in the Management Agreement and the Loan Agreement (as defined in the Cash Collateral Order); it is further

ORDERED that to the extent that the terms of the Management Agreement conflict with either: (i) the terms or provisions of the Cash Collateral Order; (ii) the terms or provisions of this Order; or, (iii) the terms of any of the Loan Documents (as defined in the Cash Collateral Order), the Loan Documents, this Order, and/or the Cash Collateral Order shall be controlling and govern; it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

SIGNED this _____ day of _____, 2015.

LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE

**APPROVED AS TO FORM ONLY AND ENTRY REQUESTED:**

**Okin & Adams, LLP**
1113 Vine Street, Suite 201
Houston, Texas 77002
(713) 228-4100 (Telephone)
(888) 865-2118 (Facsimile)


By: _____ /s/ Christopher Adams _____
      Christopher Adams
      Texas Bar No. 24009857

**ATTORNEYS FOR THE DEBTORS**

   **AND**

**Harold N. "Hap" May**
**Attorney at Law**
Two Riverway, 15th Floor
Houston, Texas 77056
(281) 407-5609 (Telephone)
(832) 201-7675 (Facsimile)


By: _____ /s/ Harold N. May, III _____
      Harold N. May
      Texas Bar No. 13264800

**ATTORNEYS FOR PREFERRED**
**INCOME PARTNERS IV, LLC**


**WINSTEAD PC**
1100 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
(713) 650-8400 (Telephone)
(713) 650-2400 (Facsimile)


By: _____ /s/ Sean B. Davis _____
      Joseph G. Epstein
      Texas Bar No. 06639320
      S.D. Tex. No. 11733
      Sean B. Davis
      State Bar No. 24069583
      S.D. Tex. No. 1048341

**ATTORNEYS FOR JPMCC 2006-LDP7**
**OFFICE 2401, LLC**

## MANAGEMENT AND EXCLUSIVE LEASING AGREEMENT

THIS MANAGEMENT AND EXCLUSIVE LEASING AGREEMENT ("Agreement") is made and entered into as of the _____ day of January 2015 (the "Effective Date") by and between, ASR 2401 Fountainview, LP, a Delaware Limited Partnership, ("Owner") and Jetall Companies, Inc. ("Jetall") ("Agent").

WITNESSETH

WHEREAS, Owner is the owner of the real property described on Exhibit "A" attached hereto and made a part hereof for all purposes, and all improvements located thereon (the "Project").

WHEREAS, Owner wishes to appoint Agent as an independent contractor for the operation and management of the Project, and for the exclusive leasing of the Project, on the terms set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, Owner and Agent hereby agree as follows:

ARTICLE I

AGREEMENT TO MANAGE

Section 1.01                                                    Agreement to Manage.   Owner hereby appoints Agent as the manager for the Project and Agent hereby accepts such appointment on the terms herein provided.

ARTICLE II

AGREEMENT TO LEASE

Section 2.01                                                    Agreement to Lease.   Owner hereby appoints Agent as the exclusive leasing agent for the Project and Agent herby accepts such appointment on the terms herein provided.

ARTICLE III

MANAGEMENT DUTIES OF AGENT

Section 3.01                                                    Management Standard.   Agent as the independent contractor of Owner, shall operate, manage and maintain the Project in accordance with sound property management practice.   Agent shall exercise prudence and diligence in performing its duties, and shall diligently endeavor to protect the property rights and interests of Owner.

Section 3.02                                                    Operation.

EXHIBIT

tabbies

A

(a)     Agent shall continually operate the Project during the term of this Agreement, and shall perform all acts necessary or desirable for the efficient operation of the Project, within the limitations of this Agreement and of the Budget (as defined in section 3.05).

(b)     Agent shall maintain, operate and manage the Project in compliance with all applicable laws, regulations, contracts, leases, permits, licenses, ordinances, restrictions, covenants, and easements, within the limitations of this Agreement and of the Budget (as defined in Section 3.05).

(c)     In connection with its operation of the Project, Agent shall provide or arrange for the provision to the tenants of the Project all utilities and other services stipulated in all tenant leases to be provided to such tenants by Owner (provided such utilities and services are available to the building) and such other services as Owner may approve or specify in writing from time to time.

Section 3.03                                    Maintenance and Repairs.     Agent shall, within the limitations of the Budget as provided in Section 3.05 hereof, maintain the improvement, personal property and grounds located on or associated with the Project in good order and repair and in a proper state of cleanliness.  Agent shall, on behalf of Owner and at Owner's expense, make or contract for all repairs, alterations, decorations, or replacements which shall reasonably be required to preserve, maintain and keep the Project in first class condition. Agent shall not, however, without the prior written consent of Owner, make or contract for any one repair or improvement, or any series of repairs or improvements during any one (1) month period, the total cost of which will exceed $5,000 with respect to the Project, unless (i) the repair or improvements are within the limitations of the Budget, or (ii) the repair or improvement is immediately required by law or under circumstances which Agent reasonably deems to be an emergency.  Agent shall notify Owner of any expenditure made pursuant to subsection 3.03 (ii) by the close of business on the first business day following the date of such expenditure.

Section 3.04                                    Supervision of Personnel.

(a)     Agent shall supervise all personnel required for the operation, maintenance, and management of the Project, including (i) personnel employed by Agent, and (ii) parties to service contracts entered into by Agent pursuant to Section 3.07.  Such personnel shall not be employees of the Owner.

(b)     Agent shall procure and maintain, at Agent's expense, (i) worker's compensation insurance in accordance with statutory requirements, and (ii) employer's liability insurance, covering any of Agent's employees working on or about the Project.

Section 3.05                                    Budget.

(a)     Within sixty days following the date of this agreement and at least sixty (60) days prior to the commencement of each new calendar year thereafter until the termination of this Agreement, Agent shall prepare and submit to Owner for approval a proposed operating budget for the Project setting forth an itemized statement of the estimated receipts and disbursements for the Project for the new calendar year, based upon a current rent schedule therein and taking into account without limitation, (i) the Operating Expenses of the Project, (ii) the physical condition

of the Project, and (iii) occupancy of the Project, and rental charged in the competing projects in the areas. A statement from Agent outlining a plan of operation and justifying the estimates made in every category of the proposed budget shall be submitted to Owner as part of the proposed budget for Owner's written approval.

(b)     Following the written approval by Owner of the proposed budget, as submitted or as modified in accordance with Owner's instructions, as the case may be, the approved budget ("Budget") shall constitute the standard to which the Agent shall adhere for each respective Project until a new Budget is approved by Owner pursuant to this Section 3.05(b). Except in the case of repairs permitted by Section 3.03 hereof, no expense shall be incurred and no commitment shall be made by Agent in excess of the amounts allocated to the various classifications of expense in the approved Budget without prior written consent of Owner.

(c)     The "Operating Expenses" of the Project shall include, but not limited to, the following items:

(1)     Real and personal property taxes on the Project;
(2)     Premiums on insurance for the Project as determined under Section 8.01;
(3)     License fees, leasing commissions and management fee;
(4)     Repairs and maintenance of the Project;
(5)     Advertising and promotional expenses for the Project, lease signs and brochures;
(6)     Charges for utility services and extermination services for the Project;
(7)     Charges for security guard service for the Project;
(8)     Charges for janitorial, trash removal and landscaping services for the Project;
(9)     Charges for supplies used exclusively for maintenance of the Project, such as light bulbs, air filters, and cleaning supplies;
(10)    Legal fees in connection with the preparation and enforcement of leases and other agreement required in connection with the operation of the Project;
(11)    Salaries, related taxes and benefits for all on-site or allocated employees who work at the Project in accordance with the staffing recommendation periodically submitted to and approved by Owner;
(12)    Any other expenses approved by Owner.

Section 3.06                                        Reports.

(a)     By the 15th day of each calendar month, Agent shall submit to Owner a monthly report for the Project for the prior month (on either cash or accrual method, as selected by Owner) showing actual performance for such month and for the year to date. Such reports shall show all rents and other charges collected, all delinquencies, all amount forwarded by Agent to Owner pursuant to Section 3.08, and all disbursements approved by Agent to be made with respect to such Project pursuant to Section 3.08. As a part of each monthly report submitted by Agent to Owner for the Project, Agent shall include a copy of the monthly rent roll for the Project.

(b)     Within forty five (45) days after the close of each calendar year (or portion of a calendar year at the termination of this Agreement), Agent shall deliver to Owner detailed financial statements for the operation of the Project for such year. At the cost and request of

Owner the annual statement shall also be certified as true and correct by a certified public accountant chosen by the Owner. Agent shall also submit to Owner such other statements and reports as Owner shall reasonably request from time to time.

(c)     Agent shall maintain adequate and complete books, records, receipts, invoices, contracts, and files for the Project, and complete and current files for all leases of space in the Project, all of which shall be the property of the Owner and shall be kept separate and apart from the Agent's books and records. Owner shall have access to all books and records relating to the Project at all reasonable times and shall have the right to audit such books and records. Any adjustments in amounts due and owing by Agent to Owner as a result of information discovered by any audit performed by Owner shall be paid by Agent to Owner within (15) days following receipt of the audit by Agent. Upon termination of this Agreement, Agent shall deliver to Owner a complete copy of all books, records and other items required to be maintained by Agent pursuant to this Section 3.06.

Section 3.07 _____ Service and Goods Contracts.

(a)     Subject to the limitations of the Budget, Agent shall make in Owner's name contracts for all services required in order to maintain the Project and to satisfy the obligations of Owner under all tenant leases in the Project, including without limitation, contracts for utility and energy services, extermination, trash removal, air conditioning and heating maintenance, security, cleaning, and landscaping maintenance. Notwithstanding the foregoing, Agent shall not be authorized to execute any contracts for services without Owner's prior written approval unless such contracts provide that they can be terminated without cause upon no more than 30 days prior written notice. All such service contracts shall provide that the entity providing services thereunder shall be independent contractors and shall maintain worker's compensation insurance in accordance with all legal requirements and adequate employer's liability insurance coverage.

(b)     Agent shall place orders in Agent's name for such equipment, tools, appliances, materials, and supplies as are necessary to properly maintain the Project, subject to the limitations of the Budget. Without the prior written approval of Owner, Agent shall not be authorized to execute any contracts for services or goods with direct or indirect affiliates of Agent, its officers, directors, shareholders, or employees. When taking bids or issuing purchase orders, Agent shall attempt to secure for and credit to Owner any discounts, commissions, or rebates obtainable as a result of such purchases.

Section 3.08 _____ Collections and Disbursements.

(a)     Agent shall employ industry standard efforts to collect all rents and other sums payable with respect to the Project, including without limitation, all base, percentage, and additional rentals collected from tenants of the Project, security deposits, late charges, vending machine commissions, and all other miscellaneous income.

(b)     All such sums so collected by Agent shall be deposited in a separate account established by Agent, in a manner to indicate the custodial nature thereof, in a bank or financial institution insured by the F.D.I.C. Agent shall withdraw from this account any and all payments for the operating expenses of the Project and to discharge the Agent's responsibilities and duties

incurred under this Agreement, including the payment of Agent's compensation, subject to the limitations of the Agreement. Agent shall pay to Owner each month the net cash flows from operations less a prudent reserve for contingencies.

(c)     In the event the balance in the account is at any time insufficient to pay the operations expenses and other disbursements required to be paid by Agent under this Agreement, Agent shall so inform the Owner and the Owner agrees to promptly remit such funds to Agent. Agent shall not be required to use its own funds to pay such disbursements. Notwithstanding anything herein to the contrary, Agent shall be promptly reimbursed for all herein approved expenses incurred by Agent in the performance of its duties under this Agreement.

(d)     Agent shall (without resort to legal proceedings, unless otherwise instructed or approved by Owner) diligently enforce the provisions of all tenant leases and contracts with regard to the Project. Agent shall timely use industry standard efforts to request, demand, collect, and receive all rent and other charges due from tenants of the Project and, upon receipt of the specific approval of the Owner in each instance, shall institute legal proceedings in the name of the Owner for the collections thereof and for dispossession of tenants and other persons in the Project. Expenses incurred in connection with the collection of rent and other charges and the prosecution of legal proceedings, including legal fees, shall be deemed Operating Expenses of the Project for purposes of this Agreement

Section 3.09                                          Miscellaneous.

(a)     Notices.   Agent shall notify Owner promptly in writing of all significant occurrences and circumstances affecting the Project or its operation or affecting in any manner the interest of Owner in and to the Project, including but not limited to notices from any governmental or municipal authority or any insurance company.

(b)     Tenant Complaints.   Agent shall maintain business-like relations with tenants, and shall receive and log all tenant service requests in a systematic fashion. Complaints of a serious nature shall, after investigation by Agent, be reported to Owner with Agent's recommendation for resolution.

(c)     Inspection.   In order to require full performance by tenants of all maintenance and other obligations under tenant leases of space in the Project, Agent shall make regular inspections of the Project, including all rentable and common areas, and shall make such other inspections as may be required or contemplated under tenant leases. Agent shall promptly report to the respective tenant and to Owner any evidence of non-compliance by tenants with any maintenance or other obligation.

(d)     Returns Required by Law.   Agent shall timely execute and file all forms, reports, and returns (excluding U.S. Federal income tax returns) required by law relating to the employment of personnel by Agent and the operation of the Project (excluding Owner's Federal Income Tax, state franchise tax and state employment tax returns and reports).

(e)     Compliance with Legal Requirements.   Agent shall take such action as may be necessary to comply with any and all orders or requirements affecting the Project by any federal, state, county, municipal, or other authority having jurisdiction thereover, and orders of the Board

of Fire Underwriters or other similar bodies, subject to the limitations of the Budget in connection with the making of repairs and alterations, provided, however, that Agent shall not take any such action as long as Owner is contesting, or has affirmed to Agent its intention to contest any such order or requirement.  Agent shall promptly, and in no event later than the close of the next business day following Agent's receipt of any legal requirement not contemplated by Agent or Owner in preparing the Budget, give written notice to Owner of any such requirement.

      (f)     <u>Claims for Tax Abatement and Eminent Domain Awards</u>.  When requested by Owner from time to time, and for compensation to be mutually agreed to each time, Agent shall, render to Owner in the negotiation and prosecution of all claims for the abatement of property and other taxes affecting a Project and for awards for taking by eminent domain affecting a Project.

      (g)     <u>Forms</u>.  If not already in use at the Project, Agent shall cause to be prepared, and shall submit for the prior approval of Owner, a standard lease form, lease renewal form, and other agreement forms to be used by Agent for tenants of the Project.  Both prospective tenant and all proposed tenant leases and renewals shall be submitted by Agent to Owner for approval of the qualifications of the prospective tenant and the terms of the proposed tenant lease, which approval may be given or withheld at the sole discretion of the Owner.  All tenant leases shall be in the name of Owner as lessor and shall be executed by (Check One) ☐ Owner ☒ Agent on behalf of Owner.

      (h)     <u>Supervision</u>.  Agent shall perform supervision of the construction of tenant improvements in the Project.  Agent's compensation for these supervision activities is noted in Exhibit "B" attached to this Agreement.

      (i)     <u>Other Acts and Authority</u>.  Agent shall perform all other acts and services which are customary for the management of properties of like size and character of the Project or as may be required for the efficient and businesslike operation of the Project, and Agent is hereby vested with such power and authority as is reasonably necessary to carry out all of the terms of this Agreement.

      (j)     <u>Owner's Liability</u>.  Except as expressly provided in this Agreement, the Agent shall have no right to incur any liability on behalf of the Owner or to bind Owner by any contract or obligation.

ARTICLE IV

<u>EXCLUSIVE LEASING DUTIES AND AUTHORITY OF AGENT</u>

<u>Section 4.01</u>                                         <u>Leasing</u>.

      (a)     Agent, as exclusive leasing agent of Owner, shall use its best efforts to lease vacant space in the Project, and to keep the Project rented to desirable tenants in accordance with guidelines relating to rental rates, terms, financial qualifications, and other leasing requirements established from time to time by Owner.

(b)     In furtherance of Agent's leasing efforts, Agent may enlist the services of other real estate brokers without reimbursement from Owner except as otherwise provided in Section 6.01(b) hereof, provided that Agent shall, prior to enlisting the services of such other real estate brokers, take such measures as Owner shall from time to time require to protect Owner from claims of such brokers for commissions or other compensation, including without limitation, the delivery to Owner of the written agreement of such other brokers not to make any claim against Owner except for commissions agreed upon by Owner pursuant to Section 6.01(b) hereof.

(c)     Agent shall within the limitation of the Budget, advertise the Project, or portions thereof, prepare and secure advertising signs, space plans, and other forms of advertising for the leasing of the Project, all of which items shall be approved by Owner prior to publication.  Agent may place "For Lease" signs on the Project premises which include the name of Agent.  The expense of such lease signs shall be considered expense of Agent.

(d)     <u>Owner's Liability</u>.  Agent (Check One) ☒ is  ☐ is not authorized by this Agreement to execute tenant leases on behalf of Owner.

(e)     <u>Noteholder's Consent</u>.  Notwithstanding the foregoing, Agent and/or Owner shall provide a copy of all leases to be executed after the Effective Date of this Agreement (each a "New Lease" and collectively, the "New Leases") and request and receive written approval from the Noteholder (defined hereafter) prior to executing any New Lease(s) and/or paying any commissions related thereto.

ARTICLE V

<u>COMPENSATION OF AGENT FOR MANAGEMENT SERVICES</u>

<u>Section 5.01</u>                                              <u>Management Fee</u>.

(a)     The compensation which Agent shall be entitled to receive for management services performed with respect to the Project under this Agreement and leasing commissions set forth in Section 6.01 hereof shall be a fee ("Management Fee") paid by the first (1st) day of each calendar month in an amount equal to four percent (4%) of the monthly gross revenues generated by the Project.

(b)     In addition to the Management Fee described immediately above, Agent shall be entitled to receive reimbursement for the Agent's monthly management, administrative and maintenance salaries including burden and administrative expenses incurred by the Agent in the performance of the Agent's duties under the terms of this Agreement and within the limitations of the Budget (subject to approval by the Noteholder (defined hereafter)) and as further defined on Exhibit B attached hereto.

<u>Section 5.02</u>                                              <u>Construction Fee</u>.  Agent shall be entitled to receive a Construction Management Fee for each tenant construction job, general construction job or capital repair requiring supervision by Agent.  Such fees are defined on Exhibit "B" attached hereto.

ARTICLE VI

COMPENSATION OF AGENT FOR LEASING SERVICES

Section 6.01 _____ Leasing Commissions

(a)     Except as otherwise provided herein, Agent shall be entitled to a commission ("Leasing Commission") for the leasing by Agent of space in the Project.  Unless otherwise provided herein, each such Leasing Commission payable to Agent shall be four percent (4%) of the total gross rentals payable by the tenant under the lease during the primary term of the Lease ("Total Gross Rentals").  All Leasing Commissions provided for under this Agreement shall be earned upon execution of the Lease and shall be payable by Owner to Agent (or any co-Agent) one half upon execution of the Lease and the balance due and payable on the date of occupancy by the tenant of the space leased in the Project.  Agent shall only be entitled to a Leasing Commission for leases executed during the term of this Agreement or within ninety (90) days following the termination of this Agreement on prospective tenants previously contacted and registered by Agent.

(b)     If an outside broker or agent ("Co-Agent") shall assist in the leasing of the space in a Project to a tenant during the period specified in Section 6.01 (a), then Owner shall (i) pay Agent a Leasing Commission of two percent (2%) of the Total Gross Rentals under such Lease, and (ii) pay the Co-Agent a leasing commission ("Co-Agent Leasing Commission") of up to four percent (4%) of Total Gross Rentals.

(c)     In addition, during the term of and within ninety (90) days of the termination of this Agreement, Agent shall be entitled to a Leasing Commission for renewals of leases by existing tenants of the Project in an amount equal to two percent (2%) of the Total Gross Rentals payable under such renewal Lease.  The Leasing Commission shall be paid by Owner to Agent on the date of renewal by tenant.  If an outside Broker or agent ("Co-Agent") shall assist in renewal, then Owner shall also pay the Co-Agent a leasing commission of and within ninety (90) days of the termination of up to four percent (4%) of the Total Gross Rentals and agent shall then only be paid two percent (2%).

(d)     During the term of and within ninety (90) days of the termination of this Agreement, Agent shall be entitled to a Leasing Commission of four percent (4%) of the Total Gross Rentals payable by the tenant with respect to expansion space leased by a tenant of the Project.  Such Leasing Commission shall be paid by Owner to Agent as provided for herein above in Section 6.01(a).  If an outside Broker or agent ("Co-Agent") shall assist in leasing an expansion space, then Owner shall also pay the Co-Agent a leasing commission of up to four percent (4%) of the Total Gross Rentals and agent shall then only be paid (2%).

ARTICLE VII

TERMINATION

Section 7.01                                              Term and Termination.

(a)     This Agreement shall commence on the ____ day of January 2015 and shall thereafter continue for a one (1) year period unless earlier terminated as provided in this Section 7.01 or until the earlier to occur of (i) the consummation of a sale or disposition of the Project to anyone other than an affiliate of Owner, or (ii) the first anniversary of the date hereof; provided, however, that this Agreement shall be automatically renewed for additional one year terms on each anniversary date of the date hereof unless sooner terminated by either party in accordance with the terms hereof.

(b)     Notwithstanding any other provision of this Agreement, this Agreement may be terminated at any time with or without cause by Agent or by Owner upon thirty (30) days for management and two (2) weeks for leasing with written notice to the other party.

(c)     In the event this Agreement is terminated, then each party shall be thereafter relieved if all further obligations or liability hereunder from and after the date of termination, except for (i) compensation and reimbursements due and payable to Agent hereunder attributable to services rendered prior to termination (and within three (3) months after termination in the case of leasing compensation pursuant to Section 6.01), (ii) and for the duties and obligations expressed herein and required to be performed following such termination under Section 7.02, and (iii) Owner's indemnity obligations under Section 8.02.

Section 7.02                                          Obligation of Agent upon Termination.
Upon termination of this Agreement, Agent shall forthwith (i) surrender and deliver to Owner of the Project all new cash flow of the Project after deducting any operating expenses due as of the date of such termination, (ii) deliver to Owner any moneys due Owner under this Agreement received by Agent after such termination, (iii) deliver to Owner all materials and supplies, keys, books, records, contracts and documents, and such other accounting papers and items pertaining to this Agreement as Owner shall request, (iv) assign such other existing contracts relating to the operation and maintenance of the Project as Owner shall require, and (v) furnish all such information and take all such action as Owner shall reasonably require (without incurring any out of pocket expenses) in order to effectuate an orderly and systematic ending in Agent's duties and activities hereunder.  Within thirty (30) days after such termination, Agent shall deliver to Owner the monthly written reports required by Section 3.06(a) hereof for any period prior to the date of termination not covered by the reports previously delivered to Owner.  Within sixty days after such termination, Agent shall deliver to Owner financial statements as required by Section 3.06(b) for the calendar year or portion thereof ending on the date of termination, such statements to be certified by a duly authorized officer or Agent.

# ARTICLE VIII

## INDEMNIFICATION

Section 8.01 _____ Waiver of Subrogation.  Whenever (a) any loss, cost, damage or expense resulting from any casualty or occurrence is incurred by either of the parties to this Agreement in connection with the Project, and (b) such party is then covered (or is required under this Agreement to be covered) in whole or in part by insurance with respect to such loss, cost, damage or expense, then the party so insured hereby releases the other party from any liability it may have on account of such loss, cost damage or expense to the extent of any amount recovered by reason of such insurance (or which would have been recovered if such party had been insured as required herein), and waives any right of subrogation which might otherwise exist on account thereof.  Such release of liability and waiver of the right to subrogation shall not be operative in any case where the effect thereof is to invalidate such insurance coverage or increase the cost thereof) provided, that in the case of increased cost, the other party shall have the right, within (30) days following written notice, to pay such increased cost), thereupon keeping such release and waiver in full force and effect Landlord and Tenant shall use their respective best efforts to obtain such a release and waiver of subrogation from their respective insurance carriers and shall obtain any special endorsements, if required by their insurer, to evidence compliance with the aforementioned waiver.

Section 8.02 _____ Indemnification.  Owner hereby agrees to indemnify, defend, and hold Agent harmless from and against any and all claims, demands, liability, cost, and expense ("Claims") including reasonable attorney's fees, arising out of or in any way connected with any action by Agent taken in good faith and within the scope of Agent's duties under this agreement, INCLUDES CLAIMS ARISING IN WHOLE OR IN PART OUT OF THE NEGLIGENCE OF AGENT, BUT EXCLUDES THOSE ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL, MISCONDUCT OF AGENT, FOR WHICH CONDUCT AGENT AGREES TO INDEMNIFY OWNER.

Owner's obligations shall include the obligation to defend Agent against claims against which Agent is indemnified, including costs of attorney's fees for an attorney or attorney(s) reasonably approved by Agent, together with costs and expenses of such defense including without limitation court costs.  Owner's obligation under this indemnity shall arise at such time as any indemnified Claim(s) is/are made against Agent, and it shall not be necessary that any such Claim be the subject of litigation or other legal action.

Agent shall be liable for any damage to or diminution in value of the Project caused by or resulting from the willful misconduct or gross negligence of Agent, and Owner shall not indemnify Agent for any causes of action, claims, costs, expenses, demands, liability, or damages related to Agent's willful misconduct or gross negligence with respect to the Project.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

Section 9.01                                           Notice.   Any   notice,   demand,   or
communication required or permitted hereunder shall be deemed effectively given when mailed
by registered or certified mail, postage prepaid, return receipt requested, addressed to the
following addresses or to such other addresses as any party may hereafter designate by written
notice:

|  | |
|---|---|
| TO OWNER: | ASR-2401 Fountainview, LP<br>2401 Fountainview Drive, Suite 510<br>Houston, Texas 77057 |
| TO AGENT: | Jetall Companies, Inc.<br>2425 West Loop South<br>Houston, Texas 77027 |
| TO NOTEHOLDER: | JPMCC 2006-LDP7 OFFICE 2401, LLC<br>c/o Winstead PC<br>Attn: Joseph G. Epstein & Sean B. Davis<br>1100 JPMorgan Chase Tower<br>600 Travis Street<br>Houston, Texas 77002 |

Section 9.02                                           Headings.  The headings used herein are for
purposes of convenience only and should not be used in construing the provisions hereof.

Section 9.03                                           Covenant of Further Assurances.    The
parties hereby agree to execute such other instruments and/or perform such other acts as may be
reasonably necessary to carry out the purposes of this Agreement

Section 9.04                                           Entire   Agreement.    This   document
represents the entire agreement between the parties with respect to the subject matter hereof, and
to the extent inconsistent therewith, supersedes all other prior agreements, representations, and
covenants, oral or written.  Notwithstanding anything to the contrary herein, this Agreement and
its terms remain subject to and are governed by the terms, rights, obligations, and covenants set
forth in the Loan Documents (defined hereafter) between JPMCC 2006-LDP7 Office 2401, LLC
(the "Noteholder"), and its successors and assigns, and Owner and its successors and assigns,
including, but not limited to the Noteholder's right to review and approve all leases as set forth
herein and in the Loan Agreement (as defined in the Cash Collateral Order).  This Agreement
also remains subject to applicable law, including, but not limited to, the provisions of title 11 of
the U.S. Code, and any orders issued from a court or tribunal of competent jurisdiction, including
the U.S. Bankruptcy Court for the Southern District of Texas.

Section 9.05 _____ Assignment.   Agent shall not, without Owner's prior written approval, which Owner may in its sole and absolute discretion withhold, assign any of its rights or obligations under this Agreement, whether by operation of law or otherwise, or permit any change in the identity of the person or persons who are in effective control of the management of Agent's business, or make any subcontract with respect to the performance of any of its obligations hereunder, or delegate any of its duties hereunder.

Section 9.06 _____ Successors and Assigns.  Except as limited in Section 9.05 hereof, this Agreement shall be binding upon and inure to the benefit of the parties, their heirs, devises, legal representatives, successors and assigns.

Section 9.07 _____ Attorney's Fees.   In the event of any controversy, claim or action being filled between the parties respecting this Agreement or in connection with the Project, the prevailing party shall be entitled, in addition to all expenses, costs or damage, to reasonable attorney's fees, whether or not such controversy was litigated or prosecuted to judgement.

Section 9.08 _____ Time of the Essence.  Time is of the essence in this Agreement

Section 9.09 _____ Governing Law.  This agreement shall be governed by and construed in accordance with the laws of the State of Texas.

Section 9.10 _____ No   Advertising.    No   publication, announcement or other public advertisement of Owner's name in connection with the Project shall be made by Agent without the prior written approval of Owner.

Section 9.11 _____ Governing Agreement. To the extent that this Agreement conflicts with either the terms or provisions of: (i) the Agreed Third Interim Order Approving Use of Cash Collateral and Granting Partial Adequate Protection [Docket No. 56 in the jointly administered matters styled: *In re ASR 2401 Fountainview, LP*, Case No. 14-35322-H3-11 and *In re ASR 2401 Fountainview, LLC*, Case No. 14-35323-H3-11 (Jointly Administered under Case No. 14-35323-H3-11) in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division] (the "Cash Collateral Order"); or, (ii) the terms of any of the Loan Documents (as defined in the Cash Collateral Order) between Owner and the Noteholder, the Loan Documents and/or the Cash Collateral Order shall be controlling and govern.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as of the day and year first above written.

OWNER:                                  ASR 2401 Fountainview, LP

                                        By: ASR 2401 Fountainview, LLC, its general
partner

                                        By:_____
                                        Name:
                                        Title:

                                        ASR 2401 Fountainview, LP

AGENT:                                  Jetall Companies, Inc.

                                        By:_____
                                        Name:
                                        Title:

## EXHIBIT "A"

## <u>DESCRIPTION OF PROJECT</u>

Owner                              ASR-2401 Fountainview, LP

Property Description:              Ten (10) story commercial multi-tenant office
                                   building consisting of a total of 174,860 square feet

EXHIBIT "B"

## COMPENSATION OF AGENT

### Labor Reimbursements

Labor reimbursements and burden for administrative and engineer services shall be in addition to management fees and will be a direct cost of the property.  Leasing personnel will be at the expense of Jetall.

Owner has approved the following labor reimbursements for the Project which shall include payroll burden:

|  |  |  |
|---|---|---|
| Manager's Salary: | $5,339.79 | per month |
| Maintenance | $2,454.84 | per month |
| Porter: | $1,950.00 | per month |
| Total Labor Reimbursement: | $9,744.63 | per month |

Annual adjustments of staffing costs are subject to change based on changes to staffing.

### Leasing Commissions

|  | Jetall | Co-Broker |
|---|---|---|
| New Leases - No Outside Broker | 4% | - |
| New Leases - With Outside Broker | 2% | 4% |
| Expansion - No Outside Broker | 4% | - |
| Expansion - With Outside Broker | 2% | 4% |
| Renewal - No Outside Broker | 2% | - |
| Renewal - With Outside Broker | 2% | 4% |

### Construction Management Fees

Agent shall be paid based on the following schedule:

| Construction Protect Cost | Fee |
|---|---|
| $0 - $100,000 | 5% |
| $100,001 - $500,000 | 4% |
| $500,001 – And Above | 3% |

## AGREEMENT TO DELEGATE, ASSUME, AND ASSIGN AUTHORITY

This AGREEMENT TO DELEGATE, ASSUME, AND ASSIGN AUTHORITY (the "Agreement") is made effective this ___ day of January, 2015 (the "Effective Date") between ASR 2401 Fountainview, LLC ("ASR LLC"), Jetall Companies, Inc. ("Jetall"), and ASR Operating Partnership ("ASR").

WHEREAS ASR LLC, in its capacity as general partner of ASR 2401 Fountainview, LP (the "Limited Partnership") seeks to delegate management authority regarding certain real property located at 2401 Fountainview Drive, Houston, Texas 77057 (the "Property"), which Property is owned by the Limited Partnership, to Jetall as set forth in the Management and Exclusive Leasing Agreement (the "Management Agreement") attached hereto as Exhibit A and incorporated by reference.

WHEREAS ASR agrees to assign to Jetall any and all authority granted to ASR by ASR LLC for the purpose of managing the Property.

WHEREAS Jetall seeks to accept the delegation of authority from ASR LLC (through the Limited Partnership) pursuant to and in connection with the Management Agreement, and assume the assignment of authority from ASR for the purpose of managing the Property.

NOW THEREFORE in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties agree as follows:

ASR LLC agrees to delegate any and all necessary power and authority to Jetall that is reasonably necessary to carry out the terms and intent of the Management Agreement, including all acts and services that are customary for the management of the Property.

ASR consents to and acknowledges ASR LLC's (through the Limited Partnership) assignment of the management authority to Jetall pursuant to the Management Agreement. ASR further agrees to assign any and all power or authority as it pertains to ASR LLC to Jetall with respect to management of the Property, and acknowledges that, as of the execution of this document, ASR, American Spectrum Management Group, Inc., and/or any and all other American Spectrum Realty related entities (collectively, the "ASR Entities") are relieved of all powers and authority previously granted to them with respect to the Property. ASR understands and acknowledges that the ASR Entities are divested of any and all power or authority to act on behalf of or through ASR LLC with respect to the Property or perform any acts or services as manager of the Property.

EXHIBIT

tabbies®

B

Jetall agrees to accept the delegation and assignment of the power and authority that is reasonably necessary to carry out the terms and intent of the Management Agreement, including all acts and services that are customary for the management of the Property.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as of the day and year first above written.

OWNER:                                              ASR 2401 Fountainview, LLC

                                                    By: American Spectrum Realty Operating
Partnership, its managing member

                                                    By:_____
                                                    Name:
                                                    Title:

AGENT:                                              Jetall Companies, Inc.

                                                    By:_____
                                                    Name:
                                                    Title:

AGENT:                                              ASR Spectrum Realty, Inc.

                                                    By:_____
                                                    Name:
                                                    Title: