IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

|  |  |  |
|---|---|---|
| IN RE | ) | |
| | ) | |
| ASR 2401 FOUNTAINVIEW, LLC and | ) | CASE NO. 14-35323-H3-11 |
| ASR 2401 FOUNTAINVIEW, LP, | ) | |
| | ) | |
| Debtors, | ) | (Jointly Administered) |
| | ) | |

MEMORANDUM OPINION

The court has held a hearing on confirmation of the "Debtor's Third Amended Chapter 11 Plan of Reorganization" (Docket No. 172). The following are the Findings of Fact and Conclusions of Law of the court. A separate Judgment will be entered confirming the plan. To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such. To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

Findings of Fact

ASR 2401 Fountainview, LLC and ASR 2401 Fountainview LP (together, "Debtors") filed voluntary petitions under Chapter 11 of the Bankruptcy Code on September 30, 2014. The cases were jointly administered by order entered on October 2, 2014.

ASR 2401 Fountainview LP owns and operates an office building located in Houston, Texas. ASR 2401 Fountainview, LLC

is the general partner of ASR 2401 Fountainview LP, and has no operations other than acting as the general partner of ASR 2401 Fountainview LP.  Debtors were designated as single asset real estate entities in their Chapter 11 petitions.

Debtors' real property is encumbered by several secured claims.  Debtors executed a note, in the original principal amount of $12.75 million, secured by a first lien in the property.  The note is presently held by JPMCC 2006-LDP7 Office 2401, LLC ("JP Morgan").  Dansk ASR Investments, LLC ("Dansk") and Petrochem Development I, LLC ("Petrochem") assert second and third liens, respectively, in the property.

On February 13, 2015, JP Morgan filed a motion for relief from stay with respect to the property.  (Docket No. 74).  On March 10, 2015, The court entered an agreed order with respect to JP Morgan's motino for relief from stay.  The agreed order provided in pertinent part that, upon the occurrence of a "Stay Relief Event," the stay would lift to permit JP Morgan to conduct a non-judicial foreclosure sale of the property.  The stay relief events enumerated in the motion included, <u>inter alia</u>, Debtors' failure to obtain confirmation of a plan by May 29, 2015, and failure to satisfy JP Morgan's claim by June 30, 2015.

Debtors filed the "Debtor's Third Amended Chapter 11 Plan of Reorganization" (Docket No. 172) on May 19, 2015.  The

plan provides generally for the sale of the property to Jetall Companies, Inc. ("Jetall")[1] or its affililate.  The plan provides for payment of JP Morgan's secured claim on the closing date of the sale.  The plan provides for deferred payments to Petrochem and Dansk in reduced amounts.  The plan provides for no distribution to creditors on other allowed secured claims.  The plan provides for payment in full of priority claims and unsecured claims on the distribution date.  If there are any funds remaining after satisfaction of the preceding claims, the plan provides that the remainder will be distributed to PIP.

The plan provides in pertinent part, with respect to the secured claim of Dansk:

> The Dansk Secured Claim is deemed an Allowed Secured Claim in the reduced amount of $2,500,000.00, plus 50% of any reduction in the JPMorgan Secured Claim, including, but not limited to, any reduction in claimed pre-petition or post-petition: (i) default interest, (ii) prohibited prepayment fee, (iii)

---

[1] Prior to the filing of the instant cases and after the filing through January 6, 2015, American Spectrum Realty Operating Partnership, L.P., the Class B limited partner of ASR 2401 Fountainview LP, appears to have exercised control of Debtors.  After a mediation between American Spectrum Realty Operating Partnership, L.P. and Preferred Income Partners IV, LLC ("PIP"), the Class A limited partner of ASR 2401 Fountainview LP, PIP sought and obtained authority to assume control of Debtors.  In Debtors' motion to authorize PIP to assume control, Debtors sought to replace the prepetition and postpetition management company with Jetall Real Estate Development, an affiliate of Jetall.  Jetall Real Estate Development has continued to manage the property since January 6, 2015.

>prepayment premium, (iv) yield maintenance premium, (v) forbearance fees, (vi) attorney's fees, (vii) other charges, and (viii) interest accruing on any of the foregoing (Dansk Additional Payment Amount). If Jetall purchases 2401 Fountainview for more than $15,300,000.00, and the sales proceeds are used to pay claims (exclusive of any claim by PIP or for the PIP Equity Interest), the Dansk Secured Claim will be reduced by 50% of the difference between the actual purchase price and $15,300,000.00, up to a maximum reduction of $175,000.00.

(Docket No. 72).

Objections to confirmation were filed by the Texas Comptroller of Public Accounts ("Comptroller"); American Spectrum Realty, Inc., American Spectrum Realty Operating Partnership, LP, and American Spectrum Realty Management, LLC (collectively, the "American Spectrum Parties"); and JP Morgan.

The Comptroller objects to confirmation on grounds the plan is not clear as to the treatment of the Comptroller's priority and administrative claims. The Comptroller asserts that Debtors are jointly and severally liable for the taxes of several interrelated entities, including at least one of the American Spectrum Parties (which is itself a debtor in a Chapter 11 case pending in the Central District of California). (Docket No. 177). The Comptroller presented no evidence in support of its contention that Debtors owe the taxes of other entities. The plan provides for payment of priority claims on the Distribution Date, and of allowed administrative claims on the Distribution Date or when the claim becomes allowed. The

Distribution Date is defined to occur no more than 10 days after closing of the sale of the property.

The American Spectrum Parties object to confirmation on grounds the plan was not proposed in good faith, because it provides for sale of the property to Jetall on a "sweetheart deal" which diverts possible value away from the equity security holders of the Debtors, including the American Spectrum Parties. They also object on grounds their claims are improperly classified.  They also object on grounds the plan is not feasible.  (Docket No. 191) The evidence before the court is that the plan was developed based on a mediated settlement agreement among the parties, including the American Spectrum Parties. The mediated settlement agreement provides that each of the parties and their affiliates:

> "…forever release and discharge each other party from any and all claims, demands, or suits, known or unknown, fixed or contingent, liquidated or unliquidated, whether or not asserted in this litigation, from the beginning of time through the effective date of this Agreement, arising from or related to the events and transactions which are the subject matter of the Lawsuit or the Bankruptcy."

(Debtors' Exhibit 2).

The court finds that the American Spectrum Parties, by agreeing to the mediated settlement agreement, have waived their objections based on the amount of distribution to their class of claims.

JP Morgan objects to confirmation on five grounds. First, JP Morgan asserts that the plan impermissibly eliminates its right to credit bid. Second, JP Morgan asserts that the plan provides an impermissible injunction in favor of the Debtors. Third, JP Morgan asserts that the plan incorporates a Mary Carter agreement, which is invalid under Texas law, and thus violates Section 1129(a)(3)'s requirement that the plan be "proposed in good faith and not by any means forbidden by law." Fourth, JP Morgan asserts that the plan fails to provide adequate means for its implementation, because it does not provide for Debtors to retain any funds it could use to prosecute its claims and causes of action. Fifth, JP Morgan asserts that the plan allows for delays in payment of JP Morgan's claim, beyond the time contemplated in this court's previous agreed order on JP Morgan's motion for relief from stay. (Docket No. 192).

At the confirmation hearing, Jeff Stein, a vice president with CB Richard Ellis, testified that his firm has been engaged to provide brokerage services to Jetall. He testified that he believes Jetall will be able to obtain the financing to purchase the property by the end of June, 2015.

Glen Bell, an executive vice president with Green Bank, N.A., testified that Green Bank has a lending relationship and depository relationship with an affiliate of Jetall. He

testified that Green Bank is interested in becoming a lender to Jetall for Debtors' property, and has begun doing due diligence for Jetall's acquisition of the property. He testified that he believes Green Bank will be able to provide financing for Jetall's acquisition of the property.

Brad Parker, chief financial officer of Jetall, testified that Jetall and its affiliates own approximately one million square feet of office space, most of which is located in the Houston Galleria area. He testified that Jetall purchases properties using a mixture of equity and debt financing. He testified that, if the plan is confirmed, Jetall will be able to close the purchase of the property by the end of June, 2015.

Tom Mock, an officer of the manager of PIP, testified that Dansk and Petrochem voted in favor of the plan. No other votes were cast. He testified that the plan is proposed in good faith, and not by any means forbidden by law. He testified that each class has accepted the plan or is unimpaired. He testified that he does not know whether Debtors have engaged an appraiser or a broker to opine as to the value of the property.

## Conclusions of Law

Section 1129 of the Bankruptcy Code governs confirmation of a Chapter 11 plan. It provides in pertinent part:

(a) The court shall confirm a plan only if all of the following requirements are met:
   (1) The plan complies with the applicable provisions of this title.
   (2) The proponent of the plan complies with the applicable provisions of this title.
   (3) The plan has been proposed in good faith and not by any means forbidden by law.

                       * * *

   (8) With respect to each class of claims or interests—
      (A) such class has accepted the plan; or
      (B) such class is not impaired under the plan.

   (9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

      (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

      (B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive—

         (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
         (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

      (C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive

>> on account of such claim regular installment payments in cash—
>>
>>> (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;
>>> (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and
>>> (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and
>>
>> (D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).
>
> (10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.
>
> (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.
>
> * * *
>
> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan

>notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
>
>>(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>>
>>>(A) With respect to a class of secured claims, the plan provides—
>>>
>>>>(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>>>>(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>>>>(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>>>>(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129.

The plan complies with Section 1129. Only the issues raised by the parties are addressed below.

With respect to the Comptroller's asserted priority claim, that claim is of the type entitled to priority under Section 507(a)(8) of the Bankruptcy Code, and thus is entitled, pursuant to Section 1129(a)(9)(C), to deferred cash payments not to exceed five years.  The plan provides for payment in full no later than ten days after closing of the sale.  The court concludes that the plan satisfies Section 1129(a)(9)(C) with respect to the Comptroller's asserted priority claim.

With respect to the Comptroller's argument that the plan does not provide for its administrative claim, the Comptroller presented no evidence of its asserted administrative claim.  The court concludes that Debtors have sustained their burden of proof with respect to the question of satisfaction of administrative claims.[2]

With respect to the American Spectrum Parties' objection that the plan was not proposed in good faith, the question of good faith requires a consideration of the totality of circumstances.  <u>Matter of T-H New Orleans L.P.</u>, 116 F.3d 790 (5th Cir. 1997).  In the instant case, Debtors have proposed a plan providing for payment of all creditors in full.  The creditors objecting to confirmation on grounds of good faith

---

2 The evidence is not clear as to whether the asserted administrative expense claim arises from the ad valorem taxes of the Debtors as to their own property, or as to taxes the Comptroller asserts are owed on behalf of other entities.

were participants in a mediated settlement agreement that formed the basis for the plan. The court concludes that the plan was proposed in good faith.

With respect to the American Spectrum Parties' argument that the plan improperly classifies their claims, the argument is based on unfair discrimination against the American Spectrum Parties' claims. However, in the mediated settlement agreement, the American Spectrum Parties agreed to release their claims in exchange for the agreed treatment in the term sheet that formed the basis of the plan. The court concludes that the American Spectrum Parties' objection on classification grounds is without merit.

With respect to the American Spectrum Parties' objection based on feasibility, the testimony of Stein, Bell, Parker, and Mock all support the notion that Jetall will be able to obtain the financing necessary to close the transaction contemplated under the plan.[3] The court concludes that the plan is feasible.

With respect to JP Morgan's argument that the plan impermissibly eliminates its right to credit bid, citing RadLAX Gateway Hotel v. Amalgamated Bank, --- U.S. ----, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012), that argument depends on the

---

[3] The court notes that, if the transaction does not take place, the plan will fail. As set forth below, the court has not adjusted any of the deadlines addressed in the agreed order on JP Morgan's motion for relief from stay.

application of the "fair and equitable" standard of Section 1129(b)(2)(A) in a cramdown situation.  In the instant plan, JP Morgan's claim is unimpaired.  Thus the cramdown provisions are not implicated.  The court concludes that JP Morgan's credit bid argument is without merit.

With respect to JP Morgan's argument that the plan provides an impermissible injunction against collection actions against the Debtors post-confirmation, the plain language of the Bankruptcy Code does not prohibit the granting of such an injunction. This court is not required to follow <u>In re Bigler LP</u>, 442 B.R. 537 (Bankr. S.D. Tex. 2010), and does not find that the injunction in this plan is equivalent to a discharge, as prohibited by Section 1141(d)(3).[4]

With respect to JP Morgan's argument that the agreement with Dansk is a "Mary Carter" agreement prohibited under Texas law, no evidence was presented to support the contention that the mediated settlement is such an agreement.[5] The court concludes that the objection regarding a "Mary Carter" agreement is without merit.

---

4 The court notes that it is difficult to imagine a circumstance in which a creditor might want to bring a claim that would be enjoined under this plan, against a debtor entity that has distributed all its assets and does not contemplate operation post-consummation.  To that extent, the objection likely is more properly considered to be moot, rather than simply not prohibited by the Bankruptcy Code.

5 JP Morgan had an opportunity to present a case in chief at the hearing on confirmation.  JP Morgan elected not to do so.

With respect to JP Morgan's argument that the plan fails to provide for adequate means for its implementation, no evidence was presented as to any causes of action for which there will be insufficient funds to pursue.  The court concludes that this objection is without merit.

With respect to JP Morgan's argument that the plan impermissibly provides for the possibility of delay in the payment of JP Morgan's claim, nothing in the plan eliminates the effect of the failure to pay JP Morgan's claim on or before June 30, 2015 as a "Stay Relief Event" under the agreed order on JP Morgan's motion for relief from stay.  The court concludes that this objection is without merit.  The court concludes that the plan should be confirmed.

Based on the foregoing, a separate Judgment will be entered confirming the plan.

Signed at Houston, Texas on May 29, 2015.

_____
HONORABLE LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE